SAMUEL REID and others v. JOSEPH CHATHAM and others.

J. B. died possessed of a tract of land in 1821, intestate, and leaving him surviving six children, one of whom was H. M., who, prior to his, J. B's death, had intermarried with J. M., and was, together with her husband, living upon the *locus in quo* at the time of his death. J. M. continued to live upon the *locus in quo* and receive the rents and profits until 1843, when he sold the same to J. J., in fee simple. J. J. entered and held possession until 1852, when he conveyed the same to S. in fee simple; S. entered and has had possession ever since. Z. also, a son of J. B., was living upon the *locus in quo* at the death of his father, and continued to live thereon until 1831, when he died leaving issue him surviving; but they did not continue to live thereupon. Within seven years after the death of J. M., the children and heirs at law of H. M. brought an action to recover the *locus in quo: Held*, (1.) That the defendants claiming under J. M., who held as tenants by the curtesy, are estopped to deny the title of the plaintiffs to an undivided sixth of the *locus in quo;* and (2.) That the plaintiffs are not barred by the statute of limitations.

CIVIL ACTION in the nature of Ejectment, tried before FURCHES, J., at Spring Term, 1876, of ALEXANDER Superior Court.

The plaintiffs are the children and heirs at law of Hannah Marley, who was the wife of John Marley and the daughter of Jehu Barnes. Barnes was in possession of the *locus in quo* at the time of his death, which occurred in 1820 or 1821. John Marley and his wife Hannah had intermarried prior to the death of Jehu Barnes, and were also living upon the *locus in quo* at the time of his death. John Marley continued to live upon the *locus in quo,* and to receive the rents and profits thereof, until 1843, when he sold and conveyed the same to James James in fee simple. James went into possession of and occupied the same until 1854, when he sold and conveyed the *locus in quo* unto one Stewart in fee simple. Stewart entered and has had possession ever since.

John Marley departed this life in 1860, and his wife Hannah Marley in 1863. Jehu Barnes died in 1820 or 1821, as aforesaid, intestate, leaving him surviving six children, one of whom was Hannah the wife of John Marley. Zack, another of the surviving children, was also living upon the *locus in quo* at the death of his father, and continued to reside thereupon until about the year 1831, when he died leaving issue him surviving, but they did not continue to live thereupon after the death of their father. There was no evidence of the other children of Jehu Barnes, other than that they did not continue to live upon the *locus in quo* after the death of their father. John and Hannah Marley had issue, born alive and living, at the time of the death of Jehu Barnes. This action was commenced within seven years after the death of John Marley.

The plaintiffs offered no written evidence of their title, nor of the title of any one under whom they claimed, nor was there any evidence offered to show that the State had ever actually granted the *locus in quo* to any one.

The plaintiffs offered in evidence deeds from John Marley to James James, which together covered the *locus in quo*; one dated April 11th, 1836, another dated May 2nd, 1842, and

another December 6th, 1842. Also a deed from James James to one Stewart, the father of one of the defendants and under whom the defendants claim, dated —, 1852, stating at the time that they were offered, to be used only by way of estoppel. There was evidence tending to show that Jehu Barnes had lived upon and claimed the *locus in quo* as his own, for some thirty years, and that John Marley entered upon said lands as the tenant of Jehu Barnes, and after his death held said lands in the right of his wife Hannah. That Jehu Barnes during his possession claimed to known lines and boundaries outside of his actual possession, and which boundaries include the *locus in quo.* There was evidence tending to show the yearly value of the *locus in quo,* for the three years preceding the commencement of this action.

Mary E. Marley, a plaintiff in the action, was introduced for the plaintiffs and asked if she ever heard her father, John Marley, while in possession of the *locus in quo,* tell her mother, Hannah, how and in whose right he held possession of the same?

The question was asked for the purpose of showing that John Marley said he held the *locus in quo* in the right of his wife. The defendants objected; the objection was sustained by the Court, and the plaintiff excepted.

For the purpose of proving the same fact, the plaintiffs asked the witness if she had ever heard her father, the said John Marley, while in possession say to other persons, whose names she did not now remember, and, therefore, did not know whether they were dead or living, how he held said lands?

The defendants objected; the objection was sustained by the Court, and the plaintiffs excepted.

The defendants offered no evidence. All questions of law being reserved by the Court, the following issues were submitted to the jury:

1. Did Jehu Barnes live on the land in controversy for

28 or 30 years before his death, claiming and using the same as his own for all that time.

Answer: Did not, according to evidence.

2. How much of said land did he have in actual possession; all or only a part, and if only a part, what part and how much?

Answer: All.

3. Was there known and visible lines and boundaries to said tracts of land to which he claimed, outside of the land in actual possession, or not?

Answer: Yes.

4. Did John Marley enter upon said lands in the life-time of Jehu Barnes as his tenant, or not?

Answer: He did.

5. What has been the yearly rental value of the land in controversy for the three years preceding the commencement of this action?

Answer: $175.00.

6. How did John Marley claim to hold the land in dispute after the death of Jehu Barnes; in his own right or in the right of his wife?

Answer: In his own right.

Upon the finding of the jury, and the questions of law reserved the plaintiffs moved for judgment, and a writ of possession for the whole tract of land. The motion was overruled by the Court. The plaintiffs then moved for judgment for one-sixth part of the land. This motion was also overruled by the Court.

The defendants then moved for judgment of costs and that they go without day. The motion was allowed and the plaintiffs appealed.

*Folk* and *Armfield*, for the appellants argued:

*First.* The action of plaintiffs is not barred by the statute of limitations. Had the wife been evicted before coverture,

she would be barred by an adverse possession of three years after she was discovert, although she might have been an infant at the time of eviction. Here the eviction was not before coverture. For *eo instanti* that the land descended to the wife, *eo instanti* the husband became tenant by the curtesy initiate. At the same instant of time, his estate as tenant by the curtesy, by act and operation of law became separated from the inheritance, so as to leave a distinct estate for life vested in the husband, with the reversion in the husband and wife in right of the wife. It is precisely like the case of a reversion or remainder after an estate for life, the owner of which has no right, and therefore cannot bring his action until after the particular estate determines. Marley therefore being tenant by the curtesy at the very instant the land descended to his wife Hannah, it follows there never was a time before the death of Marley at which she or her heirs could maintain their action, (*Williams* v. *Lanier*, Busbee's Rep., p. 30, and especially at p. 38,) and consequently plaintiffs are not barred until the lapse of seven years from Marley's death.

*Secondly.* It is a rule of practice which has become a rule of law, that where both parties claim under the same person neither shall deny the title of such person. *Newland* v. *Osborne*, 3 Jones, 164. The only exception recognized to this rule is where the party desiring to avoid its operations can show that at the time he took the deed from the common grantor the title was in a third person, and can connect himself with such person. *Fry* v. *Ramseur*, 66 N. C. Rep., 460. In order that the rule may operate it is not necessary that the common grantor should have an indefeasable title. This is shown by the exception, which allows a party to avoid the rule by showing the true title in another and connecting himself with such title. All that is necessary is that the common grantor should profess by his deeds to convey the fee, or that he should be in the actual

possession of the land claiming the fee. And if it does not appear that he claimed a less estate, the presumption is that he is tenant in fee simple. *Johnson* v. *Watts,* 1 Jones' Law, 229. *Worsly* v. *Johnson,* 5 Jones, p. 72 ; Best on Presumpters, p. 68, the facts of which are precisely as here.

Neither can the defendants avoid the rule by Marley's pretense of claim in his own right after he became tenant by the curtesy. For no other title being shown, the law presumes him to have claimed as tenant by the curtesy. To hold otherwise would be to hold the wife ousted by a mere claim, for which she could have no action. *Register* v. *Rowell,* 3 Jones, 312.

The defendant desires to stop the investigation at Marley's title, but the authorities as well as the principle on which the rule is founded, proves that the law will carry the investigation back to any point in the chain from which both titles are derived. *Love* v. *Gates,* 2 Iredell's Law, 14.

*Thirdly.* The jury have found that Marley entered into possession of the land as tenant of Barnes, and the case states as a fact that while in possession he became tenant by the curtesy. Upon the accession of the freehold as tenant by the curtesy initiate, whether he was before tenant at will or for years, the tenue became instantly merged and extinguished in the freehold. Cruise Digest, vol. 1, p. 269. And both Marley and his assignees are estopped to deny the title in fee of the heirs of the wife. For there can be no estate as tenant by the curtesy consummate, unless at the instant it accrues the heirs of the wife take the inheritance. The estate of tenant by the curtesy is a continuation of the estate of the wife. And it is necessary to its existence that the moment the husband becomes tenant by the curtesy consummate, the inheritance should descend to the heirs of the wife. Upon the death of the wife the estate stands to the husband for his own life, with the reversion in the heirs of the wife. These are not distinct estates, but separate

parts of one entire estate. There is, consequently, a privity between the tenant by the curtesy and the heirs of the wife, and hence he is always estopped to deny their title. *Norwood* v. *Mason*, 4 Dev. & Bat., 442 ; Bigelow on Estoppel, 376.

*Fourthly.* By attempting to escape this conclusion, the defendant would encounter the estoppel known in the books as the " tenant estoppel." The nature of this estoppel is to bind the lessee and also the under lessee and their assignees, and all others who derive possession under them, until the estoppel is discharged by the full and complete surrender of the possession of the premises according to the original contract. Bigelow on Estoppel, p. 377 ; *Cullender* v. *Sherman*, 5 Ired., 711 ; *Lunsford* v. *Alexander*, 4 Dev. & Bat., p. 4.

It is therefore insisted the plaintiffs are entitled to recover the whole tract. The other heirs have undoubtedly lost their title by lapse of time, (*Dey* v. *Baker*, 73 N. C. Rep., p. 1,) and the title gained by the adverse possession must enure to the heirs of the wife. Had there been an actual partition and Marley had taken possession of the other shares, the title gained, by adverse possession, might have enured to him in his own right. But in this case the wife was entitled to the possession of every part, and the possession held was in her right. Consequently Marley cannot, by taking cover under his wife's estate, gain a benefit exclusively to himself. He had the benefit of all rights tolled, for life, but at his death they belong to the wife or her heirs.

*M. L. McCorkle* and *Scott & Caldwell*, contra.

RODMAN, J. 1. For the reasons which are clearly and concisely stated in the able argument of the counsel for the plaintiff, and upon the authorities there cited, we are of opinion that the defendants are estopped to deny the title of the present plaintiffs to an undivided sixth of the land sued for. Claiming under Marley, who held as tenant by

curtesy under the mother of the plaintiffs. They cannot deny the estate of such ancestor, or of the plaintiff, as her heir.

2. Upon the authorities cited, we think also that the plaintiffs are not barred by the Statute of Limitations.

3. We do not concur with the learned counsel, that the plaintiffs are entitled to recover the whole land, or more than one-sixth of it.

If John Marley and his wife had been personally in possession of the whole land for the forty years which elapsed from the death of John Barnes to that of John Marley, an actual ouster of his co-tenants would be presumed for his or her benefit, and releases from them to him or her. It might be somewhat difficult to say whether the releases would be presumed to be to the husband or to the wife; but it is not a material inquiry in this case.

Marley and his assignees held one undivided sixth of the land by virtue of his wife's estate, and assuming twenty years to be the period after which an actual ouster of his co-tenants will be presumed in favor of the tenant in possession, until the termination of that period, the possession of John Marley and his assignees was, as a co-tenant, entitled to an undivided share, and in right of, and for the benefit of their co-tenants as well as for their own. But when there has been an actual ouster, whether really or by presumption of law, by one co-tenant or the others, the possession is held by him for his own benefit, unless he be in some relation to some other person such as agent, trustee or other similar, which makes it his duty to hold it for the benefit of such other person. Cases of that sort may be conceived of, and in such cases the possession would be presumed to be consistent with the duty. If any such relation would have existed between Marley and his wife, had he have been personally in possession, none such existed between his assignees and him, or between them and his wife. They might at any

time, without any breach of duty to Marley, or his wife, have taken releases from the ousted co-tenants, and when a presumption of such releases is to be made from their long possession, there is no reason for presuming that the releases were to Marley or his wife, rather than to the actual possessors. Their possession was adverse to all the world except Hannah Marley, and was adverse to her except as to the undivided sixth, on which they had entered by virtue of her husband's conveyance, and therefore in subordination to her title.

The judgment below is reversed, and there will be a *venire de novo.*

PER CURIAM.                    Judgment accordingly.